Plaintiff has filed this suit against the defendant in which he is seeking to recover compensation for total and permanent disability as the alleged result of having inhaled and absorbed tetraethyl lead fumes or some other poisonous or injurious fumes, all in the course and scope of his employment with the defendant.
After defendant had filed its answer which was a general denial, the case was duly tried and judgment was rendered in favor of the defendant rejecting and dismissing plaintiff's demand at his costs, from which judgment the plaintiff has appealed.
The plaintiff in this case testified that on December 16, 1944 at about 7:30 or 8:00 p.m. he was engaged in washing tank cars which were being or to be loaded with tetraethyl lead when "all of a sudden" he smelled strong fumes which went through his head and made him cough and that he turned off the hose with which he was rinsing the tank cars and went into the change house where he stayed approximately ten minutes, and, after bathing his face with water, he went back to work but did not smell any more fumes. He stated that he was not exposed to the fumes as long as five minutes, did not know where the fumes came from nor did he mention in his testimony that they came from a ditch nearby, although such a fact was alleged in his petition. In fact, the record is devoid of any proof that any fumes escaped from any ditch as set forth in the petition although there was a crew of men digging a ditch approximately 100 feet from where the plaintiff was washing the tank cars, but there were no pipes in this ditch as it was being dug for that purpose.
Plaintiff felt no immediate ill effects and testified he began to feel worse each day and described his subsequent symptoms as pains in the center of his stomach and nausea, although he did not vomit, and he also suffered pain in his legs, back and shoulders. On the 23rd day of December he reported to the hospital that he had been subjected to fumes from a a tank car but he continued to work until December 29th. Plaintiff's employment was terminated by the defendant company on February 27, 1945 and the termination slip gives as the cause "sickness."
In addition to plaintiff's testimony, he offered as witnesses two members of a crew that were digging the ditch approximately 100 feet from where plaintiff was washing the tank cars who testified that at about 7 o'clock p.m. the entire crew was moved from that area on account of fumes to a distance of about 400 feet, which took them out of the range of the fumes, and these two witnesses, while eating their supper in the wash house at about 9 p.m., saw and talked to the plaintiff and asked him "what was that smelling," and the plaintiff told them, "It must have been gas or lead or something." The plaintiff made no complaints to these witnesses that night nor to his foreman or any one else. The testimony of the two witnesses, Debose and *Page 895 
Bolden, as to the dates when they smelled the fumes is very weak. The witness Debose speaks of being checked for lead poisoning about a week after smelling these fumes on December 16, 1944, and the other witness, Bolden, stated that he remembered smelling these fumes on December 16th by reason of what happened before them, that it had made them particular as "a bunch of men got mixed up in this lead area, got lead poisoning." He couldn't give the definite date of the lead spill but was sure that it was before December 16th. The records of the company show that there was a lead spill on January 15, 1945 but none before that date. This case was heard on March 12, March 16, and May 27, 1948, and the witness Bolden went to work for the Baton Rouge Engineer's Depot July 25, 1945, and although he could not remember the date, he was terminated at Dupont prior to that time. Thus, approximately three years had elapsed at the date of the trial and these two witnesses could easily be mistaken and are mistaken when they refer to the lead spill as happening prior to December 16, 1944.
Plaintiff has absolutely failed to prove where the fumes he said he smelled were coming from or the kind of fumes. Another significant fact is that although the plaintiff has alleged positively that the fumes were coming from a ditch nearby, he, as well as the two witnesses introduced in his behalf, infer that they believed the fumes were coming from the tank car and none of them ever indicated that the fumes were coming from a ditch.
Plaintiff has offered the testimony of Dr. Leo S. Butler who stated that the plaintiff had come into his office on the evening of January 12, 1945 complaining of pains behind the neck, dizziness, and pains in the shoulder and pains in the stomach, and nausea. Dr. Butler stated that such symptoms would ordinarily be associated with lead poisoning. Plaintiff gave Dr. Butler a history of having been exposed to lead fumes a month before. The doctor's examination at that time was negative objectively but he testified that plaintiff's blood pressure was rather high and at that time he based his diagnosis "on his history that he had been exposed to lead fumes and instituted treatment for the same." Dr. Butler had a blood test made which was negative.
When plaintiff reported to the defendant company on December 23, 1944 that he had been subjected to fumes, a sample of plaintiff's blood and urine was forwarded by air mail to Dr. R. A. Kehoe whom the record unquestionably proves is outstanding in the field of occupational diseases and particularly in cases of lead poisoning. An analysis of these samples showed lead below the normal limit, and it was his positive opinion that the plaintiff had not been exposed to any lead fumes. He based this opinion not only upon the analysis of the blood and urine alone but also upon the complete medical record of the plaintiff during his employment by defendant, viz., a report by Dr. J. W. McLaurin on February 26, 1946 in which he stated that an examination of plaintiff's ears, nose, throat and larynx presented no pathology other than a posterior ethmoid-sinusitis on the right side and an infected upper first molar on the left side; a report of Dr. Leo S. Butler, plaintiff's witness, in which the latter stated that he found the plaintiff suffering from an elevated blood pressure and one carious tooth, and his clinical analysis of arthritis, mild hypertension and possible chronic lead poisoning, and also a certified copy of the report of the Charity Hospital of Louisiana which stated in part, "Impression — Poss P. b. (lead) poisoning." His conclusions are found in his testimony as follows:
"Q. Now, Doctor, I ask you as a chemist and medical man, with the knowledge that you have of this case, that is, a copy of the entire medical records of the plant hospital, the medical reports of Doctors McLaurin and Butler, the Charity Hospital Report, and the analyses that you made on January 3, 1945, what is your opinion as to whether or not Raymond Grigsby had lead poisoning as a result of the alleged accident on or about December 16, 1944.
A. My opinion is that Raymond Grigsby did not have blood poisoning as the consequence of any exposure to lead suffered *Page 896 
in the course of his occupation on or about the date on which the samples of blood and urine were taken and the analyses were made.
My reason for this opinion is that the analytical data plainly demonstrates that Raymond Grigsby had suffered no significant exposure to lead compounds at any time in the period closely associated with the time of these analyses. If he had had such exposure he would inevitably have demonstrated in his blood and urine abnormal quantities of lead. The failure of the appearance of such quantities of lead demonstrates conclusively the absence of such exposure. Therefore, lead poisoning could not possibly have existed in connection with the alleged exposure.
The opinion is further based on the examination of the record of the clinical findings and the medical information, which failed completely to disclose any symptomatology which is characteristic or in any way diagnostic of lead poisoning. The symptomatology complained of, on the contrary, can better be explained by other evidences of illness and disease than that of lead poisoning.
* * * * * *
"Q. Do I understand that it is your testimony that in none of these records that have been submitted to you is there any evidence that Raymond Grigsby was suffering from lead poisoning?
A. As to the medical evidence itself available in any of these records there is nothing whatever to suggest to my mind that Raymond Grigsby was suffering from poisoning due to the absorption of tetraethyl lead. There is the opinion expressed on the part of Doctor Leo S. Butler that certain of the symptoms are frequently associated with lead poisoning and that lead poisoning probably existed.
I disagree with this opinion, both in detail and in whole, since there is no symptom referred to by Doctor Butler or otherwise in the record that is commonly associated with poisoning due to the absorption of tetraethyl lead. In fact, certain of the symptoms mentioned are incompatible with that diagnosis.
"Q. What symptoms do you have reference to? A. Specifically, reference to elevated blood pressure, since in tetraethyl lead poisoning the blood pressure is characteristically low and since, moreover, in this form of the disease pains in the arms and legs, that is to say, myalgia and arthralgia (pains in the joints) are conspicuously absent."
Also in Dr. Kehoe's report we find the following:
"Q. Even though if it be proven on the trial of this case that the man was exposed to lead fumes, left his place of business, went inside the building, and could not go back to his place for twenty or thirty minutes, and co-workers, other employees, actually saw him and talked with him, you would still rely upon your analyses? A. With respect to lead, yes, because the analyses demonstrate clearly that he had no significant exposure to lead. I am not prepared to say that he did not have some exposure to some irritant material coming from this ditch. What that might have been I have no opinion, because I do not know. I am testifying only as to the fact of his lead exposure, which I am sure did not exist in any significant form. Moreover, as to lead exposure itself there would have been no smell or no fume or no irritation which would have told him that lead was in the air because lead compounds in a ditch or on the ground or in a tank are not irritating, are not unpleasant in their smell. They are, in fact, pleasant, and except to the quite experienced individual they are not likely to be recognized at all. That constitutes the most serious danger from lead compounds, because the individual might not know that he had any exposure at all."
Taking all the testimony in this case, plaintiff has utterly failed to prove that the fumes which he smelled, if any, were coming from the tank car or from the ditch nearby and has failed to prove that he is disabled as a result of inhaling and absorbing tetraethyl lead fumes.
It is therefore ordered that the judgment of the District Court be affirmed at the cost of appellant. *Page 897